### ISAIAH WALKER v. SILAS ARMSTRONG.

#### *Error from Wyandotte County.*

By Section 613 of the Civil Code of 1858 its provisions do not apply to actions or suits pending when it took effect, until after judgment, final order or decree when they become applicable to enforce, vacate, modify or re verse the same.

This being a suit in chancery, commenced before the enactment of the Code *held* that it must be treated as a chancery suit and governed as to pleadings and practice, by the rules applicable to chancery suits in this Territory prior to the Code.

Where a bill in chancery, filed by plaintiff below sets forth that he is owner in fee of both landings of a ferry, describing it, that the Legislature of the Territory by Statute passed in 1855 granted him the exclusive right to keep a public ferry at said point for a stated number of years with the right of landing, extending for a distance specified, that he gave a bond duly approved as in said Statute required, and that defendant below claims and exercises the right of ferrying within said limits, and receives pay therefor and is constantly interrupting plaintiff's rights in the premises,

It was *held* that without the alleged franchise the acts complained of in the bill would be mere acts of trespass upon the real estate of plaintiff below whereby no such danger of irreparable injury appears as to require the issuance of an injunction.

Continuous encroachments upon a ferry franchise *held* to be a private nuisance properly abatable by injunction.

The jurisdiction to enjoin in such case, rests upon its necessity, to avoid multiplicity of suits and to protect property in the franchise.

To be entitled to an injunction in such case, the applicant must have perfected his right to the franchise by performing all conditions precedent to its exercise devolving upon him by the act granting it, and must be prepared to furnish the facilities designed to be secured by it. Until such performance no franchise exists.

Where the act granting a ferry franchise provides for the filing, by the grantee, of a bond with a tribunal named, and that until such tribunal be organized, he be allowed to proceed under the act by filing said bond with another person, *semble* that this is equivalent to an express declaration that the grantee shall not proceed nor have any rights under the act till the bond is filed.

In such a case to injoin encroachments upon the franchise, the filing must be proved. Where the only evidence of the provisions and filing of a

Walker v. Armstrong.

Statutory bond is by the obligor that he filed *a* bond for a sum named but did not know its condition, *semble* that the proof is defective. Parole evidence of the contents and filing of the bond was inadmissible. The bond should have been produced or a case made for introducing secondary evidence.

Where the record shows simply that evidence admitted by the Court under exceptions, was objected to without showing the grounds, *held* that it is too general to be available. A decree will not be reversed for an error which might have been obviated by making the proper objection in the Court below.

There is an obligation imposed upon the grantee of a ferry franchise, implied by his acceptance thereof to furnish the necessary means of transit for the traveling public. No right to enjoin others from performing this public service exists until[this obligation is fulfilled.

Where the ferry charter sets forth that the grantee agrees to furnish and run certain boats at a rate fixed by a certain tribunal with certain directions, conditions and restrictions with regard to ferriage and repairs, *it seems* that a showing by plaintiff, in a suit to enjoin encroachments upon his franchise, that he had established and was running a ferry, pursuant to the act granting the franchise, would be a sufficient pleading of performance of the conditions precedent specified in the charter; *semble* that a violation of duties imposed in the charter, where it gives a right of action therefor to those agrieved with penalty of avoidance of the charter, would not justify the running of a rival ferry, nor deprive the complainant of an injunction against one. Where he shows a vested title to the franchise, such violation would be matter of defense.

Where there is nothing in the charter requiring ownership in the landings, possession in the grantee renders his further title therein matter of indifference.

The provisions of the private Statute granting a ferry franchise, not being included in the bill for an injunction against infringements upon it, *held* that they cannot be considered in determining whether the bill is good in law.

Where the ground of error in a decree rendered under such a bill is that "the facts set forth are not sufficient to maintain the suit," *held* that the question is the same as that which arises upon a general demurrer, and is to be determined by the language of the bill alone.

A decree will not be reversed by the Supreme Court for a fault in pleading not brought to the notice of the Court below, where it appears that the defect is supplied in the proof.

Where the record does not show that the provisions of a private Statute granting a ferry franchise were set out, and the bill of exceptions purporting to contain all the evidence, omits it and fails to show that proof thereof was given in the Court below, in a suit to enjoin encroachments upon the franchise, *held* that as by the former chancery practice and pleading and by the Statute (*of* '55, *p.* 342,) applicable to the case, it was necessary to

plead and prove such private law, this omission was one of a necessary, and the leading fact in the case.

The provision in Sec. 1, chapter 68, Laws '55, (*p.* 342) providing that printed Statute books of the Territory shall be evidence of the private acts therein, facilitates but does not dispense with proof thereof. *Semble.* A. common right of landing by the public, continues until by the Legislature an exclusive right is granted. An exclusive ferry right prohibits competitors from landing their boats in the highway or upon their own soil within the limits covered by the franchise thus granted.

The Wyandotte Treaty of January 31, 1855, provided for the sale to the highest bidder of the Wyandotte Ferry, and for a conveyance thereof by patent from the United States to the purchaser which was done, to plaintiff in error. At the time, the Wyandottes were running a ferry from the land so conveyed (lying contiguous to the landing of defendant in error) across the river to a landing on land now owned by defendant, but then owned by the United States, *held* that the Wyandottes had no right of ferriage, good against a franchise granted by the Legislature.

The United States acting in aid of the Wyandottes in the transfer of the ferry to plaintiff in error, and conveying only "the rights of the Wyandottes in said ferry" did not thereby convey to plaintiff in error any interest or easement in their own land.

The case was argued by *Thomas Fenlon* for plaintiff in error, and *Wilson Shannon*, argued the case for defendant in error.

The record shows that on the 16th day of June, A. D. 1862, the defendant in error filed his amended petition in the Court below, setting forth,

1st. That he was the owner in fee of the lands on both sides of the Kansas river, at its junction with the Missouri, and for some distance up said river; that he owned the land on the south side of said river by virtue of a patent from the United States to him, dated 13th July, 1857, issued in pursuance of the 14th article of the treaty between the United States and the Wyandotte Nation of Indians, concluded at Upper Sandusky, in the State of Ohio, on the 17th day of March 1842, and ratified 5th October 1842; that he located and selected said land as early as 1843; that he owned the land on the north side of the river by virtue of a deed from Isaac N. Brown and wife, dated 24th of May 1850.

2d. That by virtue of an Act of the Legislature of the Territory of Kansas, passed in 1855, the plaintiff below was invested with the sole power and exclusive authority to run a ferry at the mouth of said Kansas river, and for two miles up said river.

3d. That the defendant had, in violation of plaintiff's rights in the premises, exercised the privilege of running a ferry within said bounds, and the plaintiff therefore prays that the defendant may be restrained from said illegal acts.

To the petition setting forth the above facts, the defendant, Isaiah Walker, (the case so far as it affected the rights of the other defendants being disposed of,) filed on the 12th of July 1862, his answer, being, 1st, in the nature of a general denial; and 2d, setting forth that, he was on the 31st of January, A. D. 1855, and still is a member of the Wyandotte Nation of Indians; that by virtue of the 2d article of said treaty there was reserved by the Wyandottes four acres of land at and adjoining the Wyandotte Ferry, near the mouth of the Kansas river, together with the rights of the Wyandottes in said ferry; that said four acres and ferry rights should be sold at public auction to the highest bidder among the Wyandotte people, and that upon the payment of the purchase money in full, a good and sufficient title should be made by the Government to the purchaser, conveying to him in fee simple absolute the said four acres and ferry rights.

3d. That on the said 31st of January 1855, the Wyandotte's were the owners of and in possession of said ferry and all things pertaining thereto, and had been since the occupancy by the Nation of said lands; that said ferry had always, during said time, been under the control of the Wyandotte Legislative Council; that on the 15th of September, A. D. 1856, the said four acres and ferry right were sold under the provision of the treaty aforesaid, and that he (defendant,) became the purchaser at the sum of

$7,000; that he paid the said purchase money in full; that the sale was approved by the proper department, and on the 16th day of September, A. D. 1861, a patent was issued to him by the Government of the United States, conveying to him the said four acres of land and the ferry right aforesaid.

4th.   That Armstrong, was one of the Commissioners on the part of the Wandotte Nation to make the treaty under which the said ferry right was sold as aforesaid, and that the said Armstrong was present and assisted in conducting said sale, and was himself a bidder and did himself bid the sum of $6,950; that at the time the said four acres and ferry right was purchased, the four acres of land was worth only sixty dollars; that immediately after the purchase as aforesaid, he (Walker) was put in possession of said ferry, including boats, ropes, tackle, &c., by the Wyandotte Nation and the Commissioner appointed by the United States in pursuance of the said treaty, and that he remained in possession until he was enjoined in this case; that at the time of the ratification of the treaty of January 1st, 1855, and at the time of the sale of said ferry, the title to all the land on the south side of the Kansas river claimed by said Armstrong was in the United States, and was at the time a Military Reservation; and that the Wyandotte Nation always landed its boats on the south side of the river upon and within the limits of a public highway, passing over the lands claimed by the said plaintiff, and that during the time said Walker used said ferry, he never landed his boat upon the lands of said Armstrong on either side of the river.

That at the date of the treaty of 31st January 1855, the Wyandotte Nation was the owner of said ferry, and that since his purchase as aforesaid, he has landed his boats only at the points used by the said Wyandotte Nation at and before the date of said treaty, being the highway on the south side, and the ferry track consisting of the said four acres on the north side of the river.

Walker v. Armstrong.

To which answer, the plaintiff filed a reply, denying the facts alleged in the answer.

On these pleadings the cause came on for trial on the 9th day of October 1862.

The record does not show that the book of Statutes of 1855 or that Chapter 25 of the special or private laws of that year granting the ferry franchise to Armstrong was introduced in evidence, nor any of its provisions.

The provisions of the Act of the Legislature of 1855, granting the ferry franchise to Armstrong, (defendant in error,) which are discussed in the opinion of the Court, are as follows:

" Sec. 1.   That Silas Armstrong, his heirs and assigns, are hereby authorized and empowered to keep a public ferry across the Kansas river, at the mouth thereof, for the term of fifteen years from and after the passage of this Act, and he shall have a landing on both sides of said river anywhere within two miles from the mouth thereof up the banks of the same.

" Sec. 2d.   That Silas Armstrong hereby consents, agrees and promises that a good substantial boat or boats, adapted to the wants of the public at the above named place, shall be kept by him, his heirs and assigns; the said boat or boats to be properly manned, attended and propelled; but he is not nor shall be compelled to run a steam ferry-boat; and t he said Silas Armstrong further agrees and promises to keep said boat or boats in good repair and running order.

" Sec. 3.   The tribunal transacting county business for the county, including that portion of the place where the said ferry is kept, on the north side of said river, when organized and established, shall, from year to year, or whenever it may think proper, fix the rate of ferriage to be charged at said ferry, and a list of the same shall be posted up at the landing or crossing of said boat or boats; and any charge made or extorted by the said Silas Arm-

strong, his heirs or assigns, more than the rates fixed by said tribunal, shall create and be a forfeiture of his rights and privileges under this Act.

"Sec. 4. The said Silas Armstrong, his heirs and assigns, shall have the exclusive privilege to establish and keep a public ferry within the limits aforesaid, for the period aforesaid; but the said Silas Armstrong, his heirs and assigns, shall execute a good and sufficient bond to be approved by the said tribunal transacting county business, and shall renew the same whenever required by said tribunal or other competent authority, conditioned that he will comply with all the conditions and provisions of this Act; the said bond shall be filed in the office of said tribunal, and may be sued on by any person agrieved, injured or unnecessarily detained by said ferry; and a copy of the same, under the seal of said tribunal, properly attested, shall be sufficient evidence of the contents of said bond in the trial had for damages.

"Sec. 5. Until said tribunal transacting county business shall be organized, said Silas Armstrong, his heirs and assigns, may be allowed to proceed under this Act by filing said bond with the secretary of the Territory.

"Sec. 6. The said Silas Arnstrong, his heirs or assigns, shall keep the said ferry and its appurtenances in good repair and condition, but shall always be allowed a reasonable time to repair, or, in case of the loss of a boat, to procure another.

"Sec 7. A non-compliance with the provisions of this Act shall work a forfeiture of the charter herein granted. (*Stat.* '55, *p.* 342)."

The record shows that the point on the evidence of filing and contents of the bond of defendant in error, (plaintiff below,) arose in the following manner:

Question by attorney for plaintiff below—"After reflection, can you state anything further in regard to the filing of the bond?" to which the defendant then excepted; the

exception was by the Court overruled, and plaintiff answered that he now remembered that at the time of bringing this suit, Col. Wm. Wier, who was his attorney, asked him "if he had filed a bond," and that he answered "yes," and "that he is now sure that he did file a bond, as stated yesterday, to all of which the defendant then and there excepted."

This evidence was introduced on the 9th day of October. On the 8th, the same witness testified "that after the passage of the Act of the Legislature of 1855, he filed a bond with the County tribunal of Leavenworth County, that he did not know the conditions of the bond or who were the securities, and thought the amount of the bond was $2,000." The record shows that "there was no evidence of any other character introduced or offered in regard to the bond."

Other facts in the case appear in the opinion of the Court.

*Thomas P. Fenlon* for plaintiff in error.

The facts alleged in the petition did not entitle the plaintiff below to the relief prayed for.

1st. Ownership of the landings alone would not entitle him to an exclusive ferry right.

The act of the Territorial Legislature of 1855 conferred upon him the sole and exclusive right of ferry at said point. The 7th section of the act under which he claimed the ferry franchise says " *That a non compliance with the provisions of this act shall work a forfeiture of the rights herein granted.*" To make his title perfect to the franchise under this act, and to ask the Court to interfere by injunction, it must be clearly and distinctly alleged in the petition that every requirement of the act granting the franchise was fully complied with. ( *See Laws* 1855, *page* 795.) By permission of the Court, after the trial of the case, the plaintiff amended his petition so as to allege the

" filing of a bond," but it does not appear *where* that bond was filed, or *when*, or for *what amount*, or by *whom approved*. No specific allegations of compliance with the conditions, precedent contained in the several sections of the act appears to have been averred.

The petition then is defective. *See* Sections 39-41 *Lewing's Ohio Code*.

*It fails to allege ownership of the land on the north side of the river.*

That it fails to plead the private statute, granting the alleged franchise, by referring to its title and the day of its passage. (*See compiled Laws of Kansas, page 144, Section* 133.)

That it fails to plead the performance of the conditions imposed on the grantee by the act, and without the performance of which no title is vested in the grantee.

At Common Law, the only way to plead a private statute under which a right was claimed, was to set it out in the pleading *in extenso*. Our Statute, above referred to, modifies the Common Law so as to permit it to be pleaded by its title, and the day of its passage. This the plaintiff failed to do, and his pleading is therefore fatally defective.

The Statute of Injunctions, (*See page* 164, *Section* 247, *Compiled Laws*,) says that "*when it appears by the petition*" that the plaintiff is entitled to the relief demanded, and that any part thereof consists in restraining the commission of any act which during litigation would produce *great or irreparable injury*, or in doing any act in violation of the plaintiff's rights, *tending to render the judgment ineffectual*, an injunction may be granted. If he does not clearly show *by his petition*, so that the Court may be *satisfied* that if the alligations of facts are true he is the owner, then *he* could not be injured. It is not enough for him to show by affidavit or proof, but he must show to a certainty *by the petition*. This the plaintiff has also failed to do, and his pleading on this ground is fatally

defective; and whatever may be the rights of the defendant below, there could be no action against him, in favor of this plaintiff, unless, as before stated, the plaintiff could show, *by his petition* his title to the matter in dispute. He must recover as in Ejectment, not on the weakness of his adversary's claim, but upon the strength of his own. Does the petition show that acts complained of would have produced *great or irreparable injury* or would *have tended to render the judgment ineffectual?* Nothing of the kind. *See Ross v. Page,* 6 *Ohio, Rep.* 116 ; *Smith v. Pettingill,* 15 *Ver. Rep.* 82 ; *Hersh v. Major, of Albany,* 9 *Wendell,* 571.

The injury must be irremediable, and not susceptible of perfect compensation in damages. *See Jerome v. Ross,* 7 *Julius' Ch. Rep.* 315.

2nd. The judgment of the Court was not sustained by sufficient evidence. Even if plaintiff below had a right to locate his claim on said land, his title would not have vested until the date of the Patent, 13th July, 1857, for until his application was approved of by the President and a Patent issued to him, he had the right to withdraw his application, and locate his *float* on different land. If, then, he could have done so, the absolute title to the said land was still in the Government, and it could not convey to him on the 13th July, 1857, any rights or privileges, appertaining to the land, which it had before that time conveyed, or agreed to convey, by treaty to other parties.

It will not be argued, that the title of defendant in error, related back to the date of his selection, 1845, as claimed in his application to the Surveyor General, and the question then recurs, what was conveyed to Armstrong by the Patent of 13th July, A. D. 1857? The land and such rights belonging to the same as the Government had to convey. By reference to the Treaty of January 31st, 1855, it will be seen, that it was agreed between the United States and the Wyandotte Indians, that the four acres on

the north side of the river, and the ferry right should be sold, which was done on the 15th September, 1856, and on the 16th September, 1861, a Patent issued to the plaintiff in error, for the four acres, and the ferry right as it existed at the date of the said Treaty of 31st January, 1855. Now, if by treaty the United States had agreed to convey the said ferry right on the 31st January, 1855, they could not, on the 31st July, 1857, convey to Armstrong anything conflicting with the rights vested by reason of the treaty of January 31st, 1855; and hence the evidence so far only shows that Armstrong became vested 13th July, 1857, with the title to the lands on the south side of the river, subject to all rights of ferriage already vested in Walker, and nothing more.

The evidence, as certified to this Court, shows no title whatever in the defendant in error to the land on the north side of the river; the only evidence on this point being the deed from one Isaac Brown and wife to defendant in error. So far as this was evidence of title, the defendant in error might as well have introduced a deed from the man in the moon and his wife.

The filing of such a bond as was required by the Act of 1855, the place where it was filed, the fact of its approval and by whom, the conditions of the bond and the amount thereof, and the names of the bondsmen's securities, were all matters of record, made so by statute, and were susceptible of record evidence in proof. Although the defendant in error really testified to the filing of the bond, yet this was oral evidence of that which had a record existence, and could be proved only by the record or a certified copy thereof. 10 *U. S. S,* 1159; 7 *U. S. Dig.* 300.

Was the evidence of the ownership of land on one side of the river, the production of the Act granting the franchise, and the *oral testimony* of the plaintiff below, that he had filed a bond,—not *the* bond required by the Act, showing all the conditions made requisite in the law, and

without one word as to compliance with the other sections of the law; was this sufficient evidence of ownership? Especially, in view of the fact, that the patent of the defendant in error conveys to him the land on the south side on the 13th July 1857, more than two years after the Government had agreed by treaty to convey the ferry rights appertaining to said land to the purchaser under the treaty of January 31st, 1855. And also in view of the fact that the Territorial Legislature attempted to grant a ferry franchise in July of 1855, when the highest power of the Government, to which the power of the said Legislature was subordinate, had granted the said ferry right on the 31st January, 1855; and also in view of the fact, that the defendant in error, who came into Court seeking equity, acknowledged by his own individual action in signing the treaty of 1855, that there was a ferry right, conceded the fact during a quarter of a lifetime, and was actually present at the sale of the ferry right, and himself bid the sum of six thousand nine hundred and fifty dollars thereon. We conclude, therefore, that the judgment of the Court was not sustained by sufficient evidence.

The Court below erred in admitting any testimony concerning the filing of the bond required by the act of 1855, because there was no allegation of facts in the petition to warrant the introduction of such testimony. The allegation is, that he "filed a bond as in said act required." *Seney's Code, p.* 103, *Secs.* 22-3-4-5-35-36-41-46-47-48.

It was for the defendant to have alleged the fact of filing, where filed, by whom approved, in what amount, &c., and then for the Court to determine under the proof whether or not "a bond was filed as in said Act required." But, suppose evidence proper under the allegation, then we contend that the record only, or a certified copy thereof, could legally establish that "a bond was filed as in said Act required." The inspection of the bond itself could

alone show to the Court that it was such as the law requir-
ed, and no other evidence was permissable.

3d.   The decision of the Court was contrary to the law
of the land.

On the 14th December, A. D. 1843, by the treaty of
Cession, approved by resolution of Congress July 25th,
A. D. 1848, the Wyandottes became vested with all the
rights which were of the Delaware Indians previous to
that time, on and concerning the lands in the forks of the
Kansas and Missouri Rivers.   On the 31st January 1855,
(*See Treaty*,) the United States and the Wyandottes made
a treaty, by which the United States expressly admit the
existence of a ferry at the mouth of the Kansas river, and
in said treaty provide for the sale of the rights of the Wy-
andottes in said ferry.   Now all the evidence shows that
no other party pretended to claim any right in said ferry.
What is a ferry ?   " It is a liberty to have a boat for pas-
sage upon a river, for the carriage of horses and men for
a reasonable toll; its purpose necessarily requires such
privileges as will make it effectual; passengers with their
horses, carriages, &c., which may be transported, may be
received and landed at the margin of the water upon the
shore, at all times of the tide, and in all state of the river,
without obligation to pay damages to the riparian proprie-
tor, and without hindrance.   The limits of the ferry are
high water on each side of the river."   *State* v. *Wilson*,
42 *Maine Rep.*, 9.

According to this definition, the admission of the Unit-
ted States in the treaty was to the full extent of the fran-
chise, including the right of landing on both sides of the
river, and the United States, being at that time the owner
of the land upon the south side of the river, could not af-
terwards deny the existence of the right to the use of the
land so far as it was necessary to the enjoyment of the fer-
ry franchise; and any subsequent purchaser of the land
on the south side of the river, took his land and title, sub-

ject to the rights previously vested in Walker, by virtue of the treaty, the sale and the patent to Walker.

Walker's title to the "four acres and the ferry franchise," became vested on the 31st January 1855. Armstrong has his title to the land from the 13th July 1857, and his pretended title to the franchise from July 1857. Could either the United States or the Territorial Legislature, convey to Armstrong a title previously vested in Walker by the most solemn and binding act of the Government? Was the power of the Territorial Legislature so much higher and greater than the treaty-making power of the United States?

*Wilson Shannon* for defendant in error.

The defendant below claimed a small tract of land on the north side of the river, known as the ferry tract, extending from the mouth of the river up the bank to the lands of the plaintiff below, on the north bank of the river. Armstrong claims his ferry franchise by virtue of his being the owner of the land on both sides of the river, and consequently the bed of the river, and also by virtue of a grant from the Territorial Legislature in 1855. *See Kansas Statutes of* 1855, *p.* 795.

A franchise is a certain privilege conferred by grant from *Government*, and whoever claims an exclusive privilege with us must show a grant from the Legislature. 3 *Kent*, 458-459, (3d *Edition*.) A grant of a franchise from the Government is in the nature of a contract, and there is an implied covenant on the part of the Government not to invade the rights vested; and on the part of the grantees to execute the conditions prescribed in the grant. 3 *Kent, pages above* If the grantee of the franchise has forfeited his right by failing to execute the conditions and duties prescribed in the grant, it is the right of the State to enforce the forfeiture, and no one else can do so. Individuals cannot enforce a forfeiture in such cases. The

State may waive the forfeiture. But the question of forfeiture is not involved in this case.

We have shown an express grant from the Legislature, and we have shown that we were the persons entitled to that grant, as we owned the landing on both sides of the river. When a party obtains a ferry right from the proper authority that right is good until it is set aside, in a legal manner or reversed by competent authority. *1st Blackford Rep.* 168-169. Admitting that there was such a road extending from the river, does that give the defendant below a right to land freight and passengers on the land of the plaintiff below ? We say clearly not, and here it may by material to inquire what rights Armstrong had as the owner of the land on the south side of the river, in reference to the bed of the river and the point of land between high and low water mark. On this point the law is well settled. Grants of land, bounded on rivers or on the margin of the same, or along the same, *above tide water* carry the exclusive right and title of the grantee to the centre of the stream. *See* 3 *Kent* 427, *and the authorities there referred to,* (*Riparian rights.*) A different rule applies to rivers and arms of the sea where the tide ebbs and flows. On streams where the tide ebbs and flows, the King in England, in this county, the State, owns the land or beach between low and ordinary high water mark. In such cases it might well be held that the owner of the land on the opposite side, would have a right to land freight and passengers at the mouth of a road or public highway, between ordinary high and low water mark. For in that case the beach belongs to the State, and not to the riparian owners of the land, and all the cases referred to by plaintiff in error are cases falling within this class. But the case before the Court did not belong to that class, but is embraced in the common law rule, recognized in all the States, and laid down as above referred to by Chancellor Kent. *See the case of Garett v. Chambers,* 3 *Ohio Rep.* 496. It follows,

therefore, that Armstrong by virtue of his being the owner of the land on the south side of the Kansas river owned to the middle of the stream, and so far as he owned the land opposite, on the north side of the river, he owned the entire bed of the river.

Walker could not, therefore, land his boats, passengers and freight on the south side of the river, without tresspassing on the lands and on the rights of Armstrong, unless there was a public road, legally established, leading out south from the river, and that road gave him the legal right to land, &c., on the land of Armstrong.

The dedication of ground for the purposes of a public road, gave no rights to others to use it without the consent of the owners, for the purposes of landing or receiving freight, 9, *S. & R.* 33 (26,) 3 *Watts Rep.* 219. This is a case directly in point. 20 *Wend.* 131. In this case the Pennsylvania cases last referred to, are quoted and approved of by the Court; and the Court in this case say that the right to land boats, &c., on another man's land is more than a mere right of way; a right to pass over the soil of another. In 3 Tenn. Rep. 264-5,—appears pages 144-5, a case in which it is decided that at Common Law there is no right in the public or individuals, to tow boats on the margin or banks of navigable rivers. Not even between high and low water mark.

It may be of some importance in this case, to look into the title of Armstrong to the land on the south side of the river. He has a patent from the Government for this land. There are no reservations or encumbrances of any kind mentioned in it. Armstrong's equitable right to this land extended far back of the date of this patent. By the 14th Article of the Wyandotte Treaty of the 17th of March 1842, the United States agree to grant by patent in fee simple, to Silas Armstrong and his heirs, (as well as to others named,) one section of land of 640 acres, out of any lands west of the Mississippi River, set apart for Indian

uses, not already claimed or occupied by *any persons* or *Tribe.* (See *U. S. Statutes at large, Vol.* 7, *p.* 608.) The land hereby granted to be selected by the grantees, *surveyed* and *patented* at the expense of the United States, but never to be conveyed, &c., without the consent of the President of the United States. By the Wyandotte treaty of 31st of January 1855, United States Statutes at large, Vol. 10, p. 1159, the reservees who had not located their reserves, were authorized to do so on any land west of the States of Missouri and Iowa, subject to pre-emption and settlement, and the restriction as to sale was taken off, and the Wyandotte Nation was dissolved, and they were made citizens of the United States.

The land in question had been selected as a military reserve by an officer of the United States, but before his report was approved of, another officer of the United States was sent out, and selected the ground where Fort Leavenworth now stands, as a military reserve, and made report thereof to the Government, which report was approved of by the President. The report first referred to, never was approved, but while in this state the Government made the grant to the Shawnees and excluded the land in question from the grant. This land therefore in 1843-4, was not claimed or occupied by any Indian Tribe or person. A mere squatter on the land and setting up no claim thereto, was not such an occupant as to prevent this land from being selected by Armstrong. It was land west of the Mississippi, and included in that vast country that had been set apart by the Government for a permanent home for the Indians.

Under these circumstances Armstrong in 1843 or 1844, selected this land on the south side of the river as his 640 acres, granted to him by the treaty of 1842. He had an undoubted right to do so, and no one had any right to call in question this location, except the Government of the United States, or those claiming title to this land under

the Government. But so far from the Government calling in question this location or selection by Armstrong, they had ratified and confirmed it, and given him a patent for the land.

Armstrong's title commenced then when he selected this land in good faith, and reported that selection to the Government. This he did in 1843 or 1844, and reported his selection or location to the Wyandotte Indian Agent. He made known at that time his location, and the land from that time was known as Armstrong's Reserve.

As soon as he reported his location to the Indian Agent, he was bound thereby. The Government would have had the right to hold him to that location. His equitable title became perfect. He had nothing more to do. It was the business of the Government to survey it and issue a patent for it. He was the real owner of the land from the time when he reported his location to the Indian Agent, for that was the only channel through which at that time he could communicate with the Government. It follows, therefore, that no treaty which the Government and Wyandotte Tribe could make subsequently to the time Armstrong's title accrued, could in any way affect his vested rights; and in no case would the Court divest him of legal or equitable rights by implication. The Wyandotte treaty of 1855, can therefore have no legal bearing in this case; for it is only by implication that it is claimed Armstrong is affected by that treaty.

Under the 2d Article of that treaty, four acres at and adjoining the Wyandotte Ferry, across and near the mouth of the Kansas River, are reserved, together with the rights of the Wyandottes in said ferry, to be sold to the highest bidder, &c., and the proceeds of said sale to be paid over to the Wyandottes. These four acres were sold to Walker at a time when lots on the landing were deemed of great value. Now, what did he buy?

The four acres adjoining the ferry and the rights of the Wyandotte Nation in said ferry. What rights had the Wyandottes in the said ferry ? A right to land on the four acres on the north side of the river. A right to the boats, ropes, tackle, &c. All this Walker got and now has, but this gave him no right to land his boats, freight and pas- sengers, on any land on the south side of the river. And we have no right and claim no right to land our boats, freight and passengers on his four acres. The Wyandottes never had any land on the south side of the Kansas River, and never claimed any. The Government never gave them any rights on the south side, and Walker's patent gives him no rights on the south side. Walker's rights as well as Armstrong's, are to be found in his patent. If the Government has not conveyed to him all that he is enti- tled to, his remedy is on the Government. But the Gov- ernment has conveyed to him all that he is entitled to, and and whether he made a good or a bad bargain has nothing to do with this case. This ferry which was established by the Wyandottes in the winter of 1843-4, was a national ferry, established by them as a nation for the free use of all the Wyandottes. The boats were procured out of the national fund, and the ferry-man was paid by the year out of the same fund. It was intended as a free ferry for the Wyandottes. When they ceased to be a nation and be- came citizens of the United States, the object of the ferry ceased, and their rights ceased.

A ferry franchise can only be obtained by *grant* from the Government, or twenty years use, which is evidence of a grant. It is not claimed that the Wyandottes ever had a grant of this ferry franchise, and the utmost length of time that a use can be claimed is some twelve or thir- teen years. But use is only evidence of grant, and may be rebutted, and where it is shown as in this case, when, and how, this ferry was established; that it was not by virtue of a grant from the Government, but that it was

established by the Wyandottes, as a free ferry for their people, and for their accommodation, without any grant from the Government, all presumptions of a grant, are dissipated, and would be if a use of twenty years had been shown. Time does not run against the Government, you cannot *prescribe* against the Government, but only against individuals. A prescription therefore would not begin to run against Armstrong, until his title had accrued. It might well be claimed therefore (although not necessarily in this case,) that the prescription would not run against Armstrong, until he had received a Patent, until the Government had armed him with the means of defending his rights. Walker has therefore no rights on the south side of the Kansas river. All his rights are confined to the four acres on the north side of the river. By the law organizing Kansas Territory, Congress vested in the Legislature the power to legislate on all rightful subjects of legislation. The granting of a ferry franchise, is a rightful subject of legislation. The grant is valid. It is a grant for the benefit of the public, and it may be conferred by *express* grant, on persons not owning the land on either side of the river. Most, if not all the States except Kansas, give the option of the ferry to the owners of the land, but if he refuses, or fails to establish a ferry when the public interests demand that there should be one established, the Legislature has the undoubted right, to grant a ferry franchise to whom they please, whether he is the owner of the land or not. And the grant is valid and binding on the State as any other contract would be, that they had the power to make. In this case, however, we own the landing on both sides of the river. We do not seek to interfere with the landing of any other person, and we have the express grant from the Legislature of this ferry franchise. It seems to me a clearer case could not be presented to the Court.

It is settled that an injunction is the appropriate remedy,

to secure to a party the enjoyment of a franchise, or Statute privilege.   1 *I. C. R.* 613-14.

*By the Court,* COBB C. J.

Armstrong commenced his suit in chancery against Walker and several others, in the late District Court of the Second Judicial District of the Territory, before the enactment of the Code of Civil Procedure, praying an injunction to restrain the defendants from encroaching upon a ferry franchise claimed by him under an Act of the Legislature of the Territory of Kansas.

The cause was continued from time to time until after the Code took effect, and after that time an amended bill was filed, an answer thereto filed by Walker, to which Armstrong replied, and the case having been disposed of as to the other defendants, the issues between Armstrong and Walker were tried before the District Court of the first Judicial District of the State, sitting in Wyandotte County.  A decree rendered pursuant to the prayer of the bill, perpetually enjoining Walker, which decree is brought here by petition in error for review.

The allegations of error in the petition are :

1st.   That the facts set forth in the petition in the case below, are not sufficient in law to maintain the action.

2d.   That the finding of the Court was not sustained by sufficient evidence.

3d.   The Court erred in admitting parole testimony concerning the filing of the bond.

4th.   The Court erred in admitting any testimony concerning the filing of the bond.

5th.   The decision was contrary to the law of the land.

By Section 613 of the Code of Civil procedure of 1858, it is declared that the provisions of this Code do not apply to proceedings in actions or suits pending when it takes effect.   They shall be conducted to final judgment or decree in all respects as if it had not been adopted.

But the provisions of this Code shall apply after judg-·ment, order, or decree heretofore or hereafter rendered to the proceedings to enforce, vacate, modify or reverse it, except as provided in Section 545. This cause must therefore be treated as a suit in Chancery and governed in the District Court, as to pleadings and practice by the rules applicable to chancery suits in this Territory prior to the taking effect of the Code.

Under these rules we will consider the errors alleged in the petition.

1st. Are the facts set forth in the petition (more properly the amended bill,) sufficient in law to maintain the suit?

The bill states in substance that Armstrong is owner in fee of the land on both sides the river at the point where he claims his ferry franchise. That the Legislature of the Territory of Kansas by a statute passed in the year 1855, granted him the exclusive right to keep a public ferry at said point for fifteen years, with a right of landing extending two miles from the mouth of the river. That he gave a bond duly approved of as in said Act required, and that the defendants claim and exercise the right of ferrying passengers within the limits of his franchise, and receive pay therefor, and are constantly interrupting his rights in said ferry.

Without the alleged franchise the acts complained of in the bill would be mere acts of trespass upon the real estate of Armstrong, and no such danger of irreparable injury appears as to require the interference of the Court by injunction. See *Ross* v. *Page*, 6 *Ohio*, 116.

The right to such relief, therefore, rests upon the alleged franchise.

An injunction is the appropriate remedy to protect a party in the enjoyment of a ferry franchise against continuous encroachments. Such continuous encroachments constitute a private nuisance which courts of equity will

abate by injunction. The jurisdiction rests on the firm and satisfactory ground of its necessity to avoid a ruinous multiplicity of suits, and to give adequate protection to the plaintiff's property in his franchise. See *Livingston* v. *Van Inger*, 9 *Johns.*, 507; *Croton Turnpike Company* v. *Ryder et al.*, 1 *J. C. Rep.*, 611; 3 *Kent*, 458.

But to be entitled to such remedy the plaintiff must have perfected his right by first filling all obligations imposed upon him by the Act granting the franchise as conditions precedent to his right of exclusive ferriage, and have placed himself in a condition to furnish to the public the facilities which the franchise was designed to secure; for while it is doubtless true as argued by the counsel for the defendants in error, that a franchise can be avoided only by the sovereignty by which it was granted, it is equally true that no franchise exists until all such conditions precedent, either express or implied, have been performed.

In this case the bill of complaint shows a legislative grant of an exclusive ferry privilege without any express obligations imposed upon Armstrong the grantee. There is, however, an implied obligation imposed upon the grantee of a ferry franchise by his acceptance of the grant, to furnish the necessary means of transit for travelers. His privileges are granted for the benefit of the traveling public, and until he is prepared to serve them he has acquired no right to prohibit others from doing so.

There is no allegation in this bill that the plaintiff below has prepared the means for transporting passengers and freight, and is offering his services to the public as ferryman, or in other words that he has established a ferry, and we think the bill defective in that respect.

Counsel have called the attention of the Court, to the Statute, under which the franchise is claimed containing a provision that Armstrong shall execute a bond conditioned that he will comply with all the conditions and provisions of the act.

Section four of said act provided for the filing of such bond with the tribunal transacting county business, and its approval by them, and Section five provides that until such tribunal shall be organized, said Silas Armstrong, his heirs or assigns, may be allowed to proceed under this act, by filing said bond with the Secretary of the Territory. *See Laws of* 1855, *pp* 795-6, *Sections* 4-5. Section five is equivalent, to an express declaration that Armstrong shall not proceed under the act till the bond is filed and admits of no doubt that such bond must be filed before he can have any exclusive right of ferriage by virtue of the act.

But these provisions are not included in the bill, and therefore in determining whether the bill is good in law cannot be considered. The question is the same as that which arises upon a general demurrer, and is to be determined by the language of the bill only. If the Statute given in evidence differs from the one stated in the bill, that fact does not show a defect in the bill but a variance between the pleading and proof.

The objection of the plaintiff in error, that the bill does not show that sections two, three and six have been complied with by Armstrong may be answered in the same way. It does not appear that there are any such sections, and consequently the bill can not be bad in law for not showing compliance with them. And had the act in question been pleaded in *extenso*, we think it would not have been necessary to plead performance to Sections two, three and six farther than to show as above indicated, that he had established, and was running a ferry pursuant, to the act.

The Statute having given to all persons aggrieved by a violation by Armstrong of any of the provisions of those Sections a right of action upon the bond provided for in the fourth Section for damages, and the State having the right to avoid the franchise for the same cause, ( *See People* v. *Thompson*, 21 *Wend.* 285,) such violation will not

justify the running of a rival ferry, (*See Colton* v. *Houston*, 4 *B. Monroe*, 288,) nor deprive the complainant of his equitable remedy, to restrain the running of such ferry. In a case of gross and continued violation of the duty imposed by the Statute, the Court might, perhaps, refuse the injunction, and leave the owner of the franchise to his remedy at law. But in such case the complainant having shown the vesting of his title to the franchise, such subsequent breach of duty would be matter of defense, to be pleaded and proved by the defendant. We think there is no defect of substance in the bill, except the one above mentioned.

That defect would have been fatal on demurrer, but the attention of the Court below does not appear to have been called to the defect; and proof of the matter so omitted in the pleading was given without objection, and a decree will not be reversed for a fault in pleading, not brought to the notice of the Court below, where it appears that the defect in pleading, is supplied in the proof. *See New York Central Insurance Co.*, v. *National Protection Insurance Co.*, 14 *N. Y.*, 85; *Belknap* v. *Sealey id.* 145; 3 *E. D. Smith*, 280.

We proceed therefore to inquire. Is the evidence sufficient to sustain the decree?

The bill of exceptions purports to contain all the evidence given on the trial, but does not contain the private Statute under which Armstrong claims his franchise, nor show that any proof of the existence of such Statute was given. The Court, probably regarded the case as governed by the Code, and took judicial notice of the Statute pursuant to Section 133, of that act. By the former common law and chancery practice and pleading, it was necessary to plead and prove a private Statute as fully as a contract, between individuals. But by Section one of Chapter sixty-eight, Page 342 of the laws of 1855, which is applicable to this case, it is provided that printed Stat-

Walker v. Armstrong.

ute books of the Territory shall be evidence of the private acts, therein contained.  This act, facilitates but does not dispense with the proof of private Statutes, and the one in·question should have been proved by the production of the Statute book in Court, and the bill of exception should have shown that it was so proved, and what it contained.

By the record then, it appears that the leading fact in the case, the passage of the Statute granting the franchise, is wholly without proof to sustain it.  But the counsel on both sides have referred us to the Statute, and argued the cause on the assumption that the Court would take judicial notice of it, doubtless regarding the case as one governed by the Code.

Whether under these circumstances the Court should take notice of the existence of the Statute and give it the same effect as if proved in the Court below, and the proof incorporated in the record, or should govern itself by the record, the view taken of other questions renders it unnecessary to decide; and we waive the discussion of the point and proceed to consider the objection to the evidence for insufficiency raised by the counsel upon the argument.

Under the statute in question, we have already observed that the filing of the bond required by section four is a condition precedent to the vesting of the franchise in Armstrong, and it follows necessarily that to make out a case for an injunction, such filing must be proved.  The only evidence on that subject was the testimony of Armstrong himself, who testified that he filed a bond with the County tribunal of Leavenworth County, and that its amount was two thousand dollars, but he did not know what was the condition of the bond and gave no further information in regard to it.

There was no proof whatever that the bond was conditioned as required by the Act in question, and therein the proof was defective, and the decree on that point not sustained by sufficient evidence.

The plaintiff claims that Armstrong failed to prove title to the land on the north side of the river.

Armstrong proved that he was in possession of a portion of the north bank of the river, having prepared a landing there, and was claiming under a deed from Brown and wife.

That was *prima facie* evidence of title. But the question of title other than possession, does not arise here. We have already held that Armstrong can not succeed in this case by virtue of title to the landing, but must succeed if at all, by virtue of his legislative grant of a ferry franchise. There is nothing in that Act requiring him to own the landings, and while he is in possession of them, and therefore in condition to land his passengers, his title to the land, is matter of indifference both to the public and the plaintiff.

This much upon the evidence in support of the claim of Armstrong.

Walker claims to have a ferry right derived from the Wyandotte Indians, and existing prior to the legislative grant to Armstrong, and therefore entitled to preference. For the purpose of settling the law of the case as far as practicable, we will consider that claim as it appears in Walker's answer and the evidence.

By the treaty between the United States and the Wyandottes made January 31st, 1855, by which the Wyandotte Nation ceded their lands in the forks of the Missouri and Kansas Rivers to the United States, to be divided and conveyed to the individual members of the tribe, it was agreed that "four acres at and adjoining the Wyandotte ferry, across and near the mouth of the Kansas River, shall also be reserved, and together with the rights of the Wyandottes in said ferry, shall be sold to the highest bidder among the Wyandotte people, and the proceeds of sale paid over to the Wyandottes. On the payment of the purchase money in full, a good and sufficient title to be

Walker v. Armstrong.

secured and conveyed to the purchaser by patent from the United States."

On the 15th September 1856, such sale was made to Walker, the plaintiff, and on the 16th September 1861, a patent was issued by the United States to him pursuant to the treaty.

What right in the ferry had the Wyandottes at the time of the treaty to be so transferred?

They were then running a ferry from the land so conveyed (which lies below and contiguous to the landing of Armstrong,) across the river and landing on land now owned by Armstrong, but then owned by the United States.

They were the owners of the ferry landing used by them on the north side of the river, and of the boats and fixtures for running the ferry, but there is no evidence of any right in them to a landing on the south side unless the landing was the mouth of a public highway.

Without examining whether it was so—or the question raised by Armstrong's counsel whether a ferry-boat may be landed at the mouth of a public highway without the consent of the owner of the soil—but for the purpose of the argument concede both these propositions to the plaintiff, and it will then appear that the Wyandottes had such right, but the same right that all other persons had to land there, and none other; and such right would continue until by the Legislature an exclusive right of ferrying at that point was granted to another, and his right perfected by performance on his part, and no longer. An exclusive ferry right prohibits competitors from landing their boats in the highway or upon their own soil within the limits covered by the franchise, as fully as elsewhere.

The Wyandottes then had no right of ferriage good against a franchise granted by the Legislature, and it is hardly necessary to say, that Walker could get by his purchase from them no greater rights than they had to sell.

29

And it is equally manifest that the United States acting in aid of the Wyandottes in transferring their property to a purchaser, and conveying in the clearest terms only "the rights of the Wyandottes in said ferry," did not thereby convey to Walker any interest or easement in their own land, afterwards conveyed to Armstrong. Parole evidence of the filing of the bonds required by the ferry charter was inadmissible. The bond should have been produced, or a case made for giving secondary evidence of its contents. But the exception appearing upon the records is too general to be available. It does not show on what ground Walker objected to the reception of the evidence. It might be on the ground that it was not the best evidence, or it might be on other and untenable grounds.

Had this objection been placed on the ground that the bond was the best evidence, it might have been obviated by production of the bond and a decree will not be reversed for an error which might have been obviated by making the proper objection in the Court below. *See Merrill* v. *Leander et. al.* 6 *N. Y.* 168; 1 *Cow.* 87.

The point made in the petition in error, that the Court erred in admitting any evidence concerning the filing of the bond, is of the same character. Had counsel stated when he made the objection as he now argues that the alligation of the bill in regard to filing the bond was insufficient, the Court might have allowed an amendment if it was deemed necessary.

We have already seen that the evidence given of the filing of the bond was insufficient, the decree must therefore be reversed with costs to the plaintiff, and the cause be remanded for the allowance of such amendment of pleadings as may be deemed proper and consistent with the laws of chancery practice in force when the suit was commenced and a new trial.

Order entered accordingly. All the justices concurring.